This Opinion Is a
Precedent of the TTAB

Hearing: June 13, 2019                    Mailed: November 20, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

____

Trademark Trial and Appeal Board

____

*In re Recreational Equipment, Inc.*

Serial No. 87186780

____

Cindy L. Caditz and Stuart Dunwoody of Davis Wright Tremaine LLP
    for Recreational Equipment, Inc.

Barbara A. Gaynor, Trademark Examining Attorney, Law Office 115,
    Daniel Brody, Managing Attorney.

____

Before Thurmon, Deputy Chief Administrative Trademark Judge, and Taylor and
Lynch, Administrative Trademark Judges.

Opinion by Thurmon, Deputy Chief Administrative Trademark Judge:

Recreational Equipment, Inc. ("Applicant") seeks registration of CO-OP in

standard characters, for "Bicycles, bicycle seats, bicycle wheels, bicycle tires, bicycle

handlebars, bicycle forks, bicycle handle bar stems," all in International Class 12.[1]

____

[1] Application Serial No. 87186780, filed on September 28, 2016 under Trademark Act Section
1(b), 15 U.S.C. § 1051(b), based upon Applicant's allegation of a bona fide intention to use the
mark in commerce. On April 3, 2018, Applicant filed an Amendment to Allege Use under

The Trademark Examining Attorney refused registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the ground that the applied-for mark is "merely descriptive of the source or provider of [A]pplicant's goods" and, as such, merely describes a "feature or characteristic of those goods."[2] Applicant filed a timely Notice of Appeal and a Request for Reconsideration.[3] The Examining Attorney denied the request and the appeal resumed. The case has been fully briefed, and an oral hearing was held on June 13, 2019. We reverse.

## I. Applicable Law

The Lanham Act prohibits registration of marks that are merely descriptive of the goods or services. 15 U.S.C. § 1052(e)(1) (barring registration of a mark which "when used on or in connection with the goods of the applicant is merely descriptive … of them"). Under this provision, a mark is merely descriptive if it immediately conveys

---

Trademark Act Section 1(c), 15 U.S.C. § 1051(c), asserting Applicant's claim of first use anywhere and use in commerce since at least as early as February 1, 2017.

[2] 10 TTABVUE 2, 10. *See also*, Office Action dated January 5, 2017, TSDR 4. Citing *In re Major League Umpires*, 60 USPQ2d 1059, 1060 (TTAB 2001), the Examining Attorney noted that, "a cooperative, or 'co-op,' is the provider of the goods identified in the application. Terms that describe the provider of a product may also be merely descriptive of the product." TSDR 4.

The Examining Attorney initially also refused registration under Trademark Act Section 2(d), 15 U.S.C. §1052(d), on the ground that the mark in U.S. Registration No. 3378104, CO-OP for "tires," originally owned by Universal Cooperatives, Inc., is likely to be confused with Applicant's applied-for mark. The Examining Attorney withdrew this refusal based on a settlement agreement between Applicant and the registrant.

Page references herein to the application record refer to the online database of the USPTO's Trademark Status & Document Retrieval ("TSDR") system. All citations to documents contained in the TSDR database are to the downloadable .pdf versions of the documents. References to the briefs on appeal refer to the Board's TTABVUE docket system. Coming before the designation TTABVUE is the docket entry number and coming after this designation are the page references or identification of exhibits, as applicable.

[3] 1 TTABVUE; 4 TTABVUE.

information about a quality, characteristic, function, feature, purpose or use of the goods with which it is used. *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) (citing *In re Gyulay,* 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987)); *DuoProSS Meditech Corp. v. Inviro Med. Devices Ltd.*, 695 F.3d 1247, 103 USPQ2d 1753, 1755 (Fed. Cir. 2012) (citing *In re Abcor Dev. Corp.*, 588 F.2d 811, 200 USPQ 215, 217 (CCPA 1978)). Descriptiveness is not evaluated in the abstract but rather "in relation to the particular goods for which registration is sought, the context in which it is being used, and the possible significance that the term would have to the average purchaser of the goods because of the manner of its use or intended use." *Chamber of Commerce*, 102 USPQ2d at 1219 (citation omitted).

## II.  The Arguments and the Evidence of Record

Applicant argues that the word "co-op" does not describe the goods, which are bicycles and certain bicycle parts, and notes that other registrations have been granted that include the word "co-op."[4] Applicant also argues that an entity identifier is not per se merely descriptive, and cites a number of registrations on the Principal Register without a claim of acquired distinctiveness for such identifiers.[5] Finally, Applicant argues that "any doubt as to the distinctiveness of Applicant's CO-OP mark

---

[4] 8 TTABVUE 8-10. The Examining Attorney rejected this argument, noting that "each case must be decided on its own facts …." 10 TTABVUE 10.

[5] 8 TTABVUE 11-14.

should be resolved in the Applicant's favor by allowing the mark to be published for opposition."[6]

The Examining Attorney maintains that the term "co-op" merely describes something about Applicant, namely, that Applicant is a cooperative business.[7] In support of the mere descriptiveness refusal, the Examining Attorney introduced the following quotation from Applicant's website:

> What Does it Mean to be a Co-op? REI started as a cooperative, or co-op, in 1938 and we've stayed true to that business structure ever since. Being a consumer co-op, rather than a publicly-traded company, enables us to focus on the long-term interests of the co-op and our members. We answer to you—our members—and run our business accordingly. And it means that we're able to operate a business that plays a vital national role in growing outdoor participation and protecting the environment for future generations. Anyone may shop at REI, member or not. But co-op members pay $20 for a lifetime membership to join and receive a portion of the cooperative's profits each year based on a percentage of their eligible purchases, among many other member benefits.[8]

This evidence, the Examining Attorney urges, shows that "applicant's own website touts the fact that it is 'the nation's largest consumer cooperative' and that '[b]eing a consumer co-op, rather than a publicly-traded company, enables us to focus on the long-term interests of the co-op and our members.'"[9] Based on this evidence, the Examining Attorney concluded "the abbreviation 'co-op' describes the provider of the

---

[6] *Id.*

[7] Office Action dated May 3, 2018, TSDR 2 ("the abbreviation 'co-op' describes the provider of the goods"). Indeed, Applicant conceded this point in its briefs. 8 TTABVUE 8 ("CO-OP describes Applicant's status as a consumer cooperative"); 11 TTABVUE 9 (same).

[8] Office Action dated May 3, 2018, TSDR 2.

[9] *Id.* (quoting from rei.com website).

goods."[10] No specific finding was made that the term "co-op" otherwise described the goods.

## III. Discussion

In view of the arguments presented by Applicant and the Examining Attorney, we first explain that there is no per se rule of law that a term descriptive of the source of goods necessarily is also descriptive of the goods. Second, we review the evidence of record to determine if it shows that CO-OP is merely descriptive of the goods.

### A. No Per Se Rule Exists on This Issue

The Examining Attorney found the term CO-OP "merely descriptive of the source or provider of applicant's goods."[11] Applicant concedes that it is a co-op, but argues the Examining Attorney did not find the proposed mark merely descriptive of the goods.[12] Relying on broad language in *In re Major League Umpires*, 60 USPQ2d 1059 (TTAB 2001), the Examining Attorney effectively used a per se rule: she found the mark merely descriptive of the source and then refused registration on the basis that

---

[10] *Id.* The Examining Attorney also pointed out that "the applicant disclaimed the term "CO OP" in its recent registration, U.S. Registration No. 5209419, and in its recent application that was approved for publication on April 20, 2018, U.S. Application Serial No. 87732559." We note the Lanham Act provides that "No disclaimer … shall prejudice or affect the applicant's or registrant's rights then existing or thereafter arising in the disclaimed matter, or his right of registration on another application if the disclaimed matter be or shall have become distinctive of his goods or services." 15 U.S.C. § 1056(b). The application subsequently resulted in issuance of a registration. The composite mark (words + design) is the same in both registrations but the identifications are for different goods and services. In the mark, a diamond separates CO and OP. The disclaimers in the two registrations differ slightly: CO OP and CO-OP.

[11] 10 TTABVUE 2.

[12] 8 TTABVUE 8-9.

the mark merely describes the goods. 15 U.S.C. § 1052(e)(1).[13] THE TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP"), however, does not recite a per se rule of law equating descriptiveness of source with descriptiveness of goods. TMEP § 1209.03(q) (Oct. 2018). Such a rule would be inconsistent with the statutory text.

### 1. The *In re Major League Umpires* Precedent

Much of the argument in this appeal turns on the meaning of *Major League Umpires*. Because so much turns on the holding of that case, we provide a somewhat extended discussion of it. The Board stated in *Major League Umpires* that, "[i]t is well-established that a term which describes the provider of goods or services is also merely descriptive of those goods and services." *Id.* at 1060 (citing *In re E. I. Kane Inc.*, 221 USPQ 1203 (TTAB 1984) and cases cited therein). Viewed by itself, this statement may appear broad. But when read in context, it becomes clear that *Major League Umpires* does not require or support the use of a per se rule.

"[E]ach case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 177 USPQ 386, 387 (CCPA 1973) (internal citations omitted). The facts in the *Major League Umpires* case were unusual. The applicant was an entity created and operated by a group of Major League Baseball umpires. *Major League Umpires*, 60 USPQ2d at 1060 ("the officers and partners of Applicant are employed as major league baseball umpires"). The goods were baseball clothing and protective gear, including gear used by umpires,

---

[13] Section 2(e)(1) refers only to goods. Services marks are also registrable, 15 U.S.C. § 1053, and are subject to the same distinctiveness requirements as trademarks. *In re Standard Oil Co.*, 275 F2d 945, 125 USPQ 227, 228-29 (CCPA 1960).

including Major League umpires.[14] The mark at issue was MAJOR LEAGUE UMPIRE. The evidence showed "applicant, in its advertisements for its goods, includes the information that it 'is owned and operated by three National League umpires: Paul Runge (# 17), Joe West (# 22), and Jerry Layne (# 24).'" *Id.*[15]

Based on this evidence, which the Board clearly deemed quite significant, and other evidence discussed below, the Board reached the entirely unremarkable conclusion that the mark "MAJOR LEAGUE UMPIRE describes the provider of the identified goods." *Id.* In fact, the Board referred specifically to Major League umpires or a variant of those terms over thirty times in less than three pages of its decision. *Id.* at 1059-62. Moreover, when the Board discussed the descriptive nature of the mark vis-à-vis the source, it pointed out that the umpires who owned and operated the business actually designed some of the goods, a fact touted in the applicant's advertising. *Id.* at 1060. Finally, the Board went on to find the mark merely descriptive of the goods.

A careful reading of the *Major League Umpires* decision suggests the Board was not making a broad holding that all terms that describe something about the source of goods are per se unregistrable as merely descriptive of the goods, but rather the

---

[14] The application identified goods in two classes: "clothing, namely, shirts, tee-shirts, jackets, caps, trousers, socks, wind resistant jackets, wristbands, uniforms and shoes," in Class 25; and "face masks, chest protectors and shin guards for athletic use," in Class 28. *Id.* at 1059-60.

[15] The applicant also used the Internet to promote the unique nature of its business. "Applicant's website also prominently advertises that it is owned and operated by three National League umpires, and the biographies of these men, also prominently featured on the website, list their activities as major league umpires." *Id.*

Board was stating that this result followed given the facts of the *Major League Umpires* case. The mark went well beyond simply describing something about the source of the goods. It also described characteristics of the goods.

Specifically, the Board found the mark "also immediately conveys to purchasers information about a designer of at least some of the goods." *Major League Umpires*, 60 USPQ2d at 1061. After citing to advertising that touted the role the owner umpires played in designing some of the goods, the Board concluded "the mark MAJOR LEAGUE UMPIRE would immediately convey to such purchasers a characteristic of the gear/clothing, i.e., that it is designed by a major league umpire."[16]

The Board went on to also find "there is no question that major league umpires are among the class of purchasers of applicant's goods." *Id.* In fact, the record showed that the applicant's goods would be sold "by mail order to umpires at all levels of professional and amateur baseball," rather than to the general public. *Id.* Finally, the Board found the mark described "the goods as being of a type used by major league umpires." *Id.* "Consumers will therefore understand the mark MAJOR LEAGUE UMPIRE, if used on the identified goods, to describe goods which are used by major league umpires." *Id.*

These findings show that the Board in *Major League Umpires* did not rely on a per se rule regarding the source of the goods. To the contrary, the Board found the mark was merely descriptive of the goods in at least three different ways. The case,

---

[16] One of the three umpires who formed applicant was the inventor of a protective vest sold under the mark. Another of the owners designed a shoe sold under the mark. These facts were touted in applicant's advertising. *Id.*

therefore, is simply an example of a situation where the evidence showed the mark was merely descriptive of both the source and other aspects of the goods, e.g. the nature of the designer and a portion of the classes of consumers.

We acknowledge that in some cases a proposed mark providing specific information about the source of the goods will be merely descriptive of the goods. *Major League Umpires* is a good example, because the evidence showed that real Major League umpires designed some of the products sold under the MAJOR LEAGUE UMPIRE mark and advertised this feature of the goods to consumers. When the mark describes a characteristic of the source, and that characteristic is used to actively promote the goods, the mark probably also describes a feature of the goods for purposes of Section 2(e)(1). *See In re MBNA Am. Bank, N.A.*, 340 F.3d 1328, 67 USPQ2d 1778 (Fed. Cir. 2003) (emphasis on the MONTANA SERIES and PHILADELPHIA CARD marks in promotional materials signifies that they are "a significant feature of MBNA's method of promoting and marketing these affinity credit cards as well as of the services themselves.").

This principle was particularly applicable in *Major League Umpires* because of the nature of the goods. If the goods at issue in *Major League Umpires* had been luxury automobiles or fly fishing gear or sewing machines, a different result may have been reached.[17] It is the connection between the mark and the nature of the goods that

---

[17] We provide these hypothetical goods to illustrate types of goods consumers would not typically associate with Major League umpires. These are merely hypotheticals and if the evidence in any particular record showed that typical consumers are likely to make the type of connection between the source and the goods that was established by the facts in the record of the *Major League Umpires* case, then a Section 2(e)(1) refusal may well be appropriate.

9

supported the Section 2(e)(1) refusal in *Major League Umpires*. Thus, the *Major League Umpires* decision should **not** be read as supporting a per se rule of law.[18]

### 2. The Trademark Manual of Examining Procedure Does Not Employ a Per Se Rule

The TMEP provides the following guidance for examining attorneys: "Terms that identify the source or provider of a product or service **may be** merely descriptive under 15 U.S.C. § 1052(e)(1) or generic." TMEP § 1209.03(q) (emphasis added). This provision cites *Major League Umpires* and other Board cases, including: *In re Taylor & Francis [Publishers] Inc.*, 55 USPQ2d 1213 (TTAB 2000) (PSYCHOLOGY PRESS merely descriptive of books in the field of psychology); and *In re The Paint Products Co.,* 8 USPQ2d 1863 (TTAB 1988) (PAINT PRODUCTS COMPANY incapable of registration for paint). These additional cases are consistent with the ones cited above.

Two decisions from the Court of Appeals for the Federal Circuit are cited in this section of the TMEP, *Chamber of Commerce*, 102 USPQ2d at 1220 and *In re Omaha Nat'l Corp.*, 819 F.2d 1117, 1119, 2 USPQ2d 1859, 1861 (Fed. Cir. 1987). Neither supports a per se rule of law. The mark at issue in *Omaha Nat'l Corp.* was FirsTier, which the Board treated as equivalent to First Tier. 2 USPQ2d at 1861. The evidence

---

[18] We reviewed other decisions by the Board and find no support for a per se rule equating descriptiveness of a source with descriptiveness of goods. *See, e.g., In re E. I. Kane, Inc.*, 221 USPQ 1203 (TTAB 1984) (involving the mark OFFICE MOVERS, INC. for "moving services, namely the moving of office facilities, warehouse facilities, industrial plant facilities, business equipment, retail facilities and other business related facilities" where the Board affirmed the refusal of the mark as an unregistrable highly descriptive term for the recited services and cited other Board decisions that reached similar conclusions); TMEP § 1209.03(q) (and cases cited therein).

showed a number of financial publications used "First Tier" to identify a certain level of banking services. *Id.* The Board found that evidence sufficient to support a Section 2(e)(1) refusal and the Federal Circuit affirmed. *Id.* Specifically, the court found the evidence to "fully support the board's finding that 'first tier' is descriptive of banking services." *Id.*[19]

In the *Chamber of Commerce* case, the Federal Circuit found "that NATIONAL CHAMBER immediately conveys information about one feature or characteristic of at least one of the designated services within each of COC's applications." *Chamber of Commerce*, 102 USPQ2d at 1220. The Federal Circuit did not adopt a per se rule of law in either of these cases.

The TMEP guidance on this point is correct: terms that describe a source may also describe the goods or services.[20] A mark that describes something about the source of goods or services should be carefully evaluated to determine whether the mark also describes something about the goods or services. The former fact will often lead to the latter, but not always. Evidence is needed to make the critical determination of whether the mark is merely descriptive of the goods or services. We read the TMEP as fully supporting this approach.

---

[19] The court rejected an argument that descriptiveness refusals should be limited to "terms which identify a characteristic or quality of an article or service." *Id.* "The factual situations in which mere descriptiveness must be resolved are too varied to lend themselves to resolution under any rigid formula." *Id.* This portion of the decision shows the reluctance of the Federal Circuit to adopt per se rules regarding descriptiveness.

[20] TMEP § 1209.03(q).

Indeed, the Examining Attorney used the TMEP language in both Office Actions, in the denial of Applicant's Request for Reconsideration and in the Examining Attorney's Brief. "Terms that describe the provider of a product may also be merely descriptive of the product."[21] The only other specific finding on this issue is, "the proposed mark is merely descriptive of the source or provider of applicant's goods."[22]

We hold that such a finding, standing alone, is insufficient to support the Section 2(e)(1) refusal. The error in this case was stopping with the conclusion that the mark described something about the source or provider. Indeed, Applicant conceded that the word "co-op" describes something about Applicant.[23] We agree with the Examining Attorney that this fact is relevant, but here it is not enough by itself to find that consumers would perceive the proposed mark as merely describing a quality, feature, or characteristic of the applied-for goods.

**B. The Evidence Does Not Support the Section 2(e)(1) Refusal**

We now evaluate the record to determine whether there is sufficient evidence to support the Section 2(e)(1) refusal.[24] We begin our review of the evidence by noting what is not in dispute. A cooperative is a type of business the members jointly own and the word "co-op" is an abbreviation of cooperative. *See* BLACK'S LAW

---

[21] Office Action dated January 5, 2017; Office Action dated May 3, 2018; 5 TTABVUE 4; 10 TTABVUE 2, 5.

[22] 10 TTABVUE 2.

[23] 11 TTABVUE 9.

[24] We are mindful of the rule that doubts regarding the descriptiveness of a mark must be resolved in favor of allowing the application to proceed to publication. *In re Fat Boys Water Sports LLC,* 118 USPQ2d 1511, 1513 (TTAB 2016). If the record were close, we might rely on this rule. We find, as explained below, that the record here falls far short of supporting the Section 2(e)(1) refusal.

DICTIONARY (11th ed. 2019) (defining "cooperative" as "1. An organization or enterprise (as a store) owned by those who use its services.").[25]

Applicant is the largest consumer cooperative in the United States and has been a cooperative since its founding in 1938. On its website, Applicant describes its background and status as a co-op.[26] There is no dispute over any of the factual evidence on this issue. Applicant concedes that it is a co-op and that it promotes that fact on its website.[27]

The record, however, lacks evidence showing what consumers are likely to think when they see the CO-OP mark on bicycles or bicycle components. The record does not include evidence of third-party use of CO-OP or "cooperative" in connection with these types of goods, a type of evidence that can signal that a term is merely descriptive. Nor does the record contain advertising with any descriptive use of the mark in connection with the goods, as existed in *Major League Umpires*. Nor is there evidence of consumer usage of the term in connection with the goods. There is no evidence of use of the term in trade publications relating to the goods. Many types of evidence can shed light on what a term means within a particular context, but no such evidence is of record here. *See generally Dan Robbins & Assocs., Inc. v. Questor Corp.*, 599 F.2d 1009, 202 USPQ 100, 105 (CCPA 1979) (identifying types of relevant

---

[25] *In re North American Free Trade Ass'n*, 43 USPQ2d 1282, 1285 n.6 (TTAB 1997) (taking judicial notice of definition from Black's Law Dictionary).

[26] 10 TTABVUE 4-5 (citing evidence showing the meaning of the term "co-op" and Applicant's website to show that Applicant is a co-op).

[27] 8 TTABVUE 8 ("CO-OP describes Applicant's status as a consumer cooperative"); 11 TTABVUE 9 (same).

evidence of consumer perception) (citation omitted). The evidence shows that some consumers may be aware that Applicant is a co-op, but the record does not support a finding that the mark CO-OP immediately conveys to average consumers information about a quality, feature, or characteristic of bicycles and the other goods identified in the application.

The word "co-op" describes Applicant's business structure. Based on the record before us, this fact alone is insufficient for us to affirm the Section 2(e)(1) refusal against the identified goods and, therefore, we reverse the refusal to register.

**Decision:** Refusal to register under Section 2(e)(1) is **reversed.**